UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
Bowling Green Division
*Electronically Filed*

ABC TECHNOLOGIES INC.,

  Plaintiff,

-v-

STRATUS PLASTICS KY, LLC,

  Defendant.

Case No. 1:23CV-55-GNS

Hon.

Mag.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff, ABC Technologies Inc. ("Plaintiff"), for its Verified Complaint for Damages and Injunctive Relief against Defendant, Stratus Plastics KY, LLC ("Defendant"), states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff is a for-profit corporation organized under the laws of Tennessee with its principal place of business located at 400 ABC Blvd., Gallatin, TN 37066.

2. Defendant is, on information on belief, a for-profit limited liability company organized under the laws of the State of Kentucky, with its principal place of business in Morgantown, Kentucky. Defendant may be served through its Registered Agent, Bill Orawski, 700 North Industrial Drive, Morgantown, KY 42261.

3. On information and belief, the members of the Defendant are not citizens of the state of Tennessee and therefore diversity exists among the Plaintiff and Defendant.

4. This Court has original jurisdiction under 28 U.S.C. § 1332(a)(1) or (2), because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States or citizens of a State and citizens of a foreign state.

5.     This Court has personal jurisdiction over Defendant because Defendant transacts business in Kentucky.

6.     Venue is proper in this forum under 28 U.S.C. § 1391(b)(2) because "a substantial part of property that is the subject of the action is situated" in Morgantown, Kentucky, within the Western District of Kentucky.

## GENERAL ALLEGATIONS

7.      Plaintiff is an automotive systems and components manufacturer that manufactures plastics processing technologies, systems and components for the global automotive industry, including General Motors ("GM") and Nissan.

8.     Defendant is a supplier of contract manufacturing services and injection molded plastic parts.

## Plaintiff Issues Purchase Orders to Defendants:

9.     In or around July 2019, Plaintiff and Defendant entered into various contracts (the "Agreements") whereby Defendant agreed to supply certain component parts (the "Parts") to Plaintiff for use in GM and Nissan (GM and Nissan are the "OEMs") vehicles.

10.    The Agreements are single-source supply agreements in the automotive industry, which runs on the just-in-time model.  In this model, neither the OEMs nor their key suppliers maintain significant part inventory.  Instead, to avoid costs, and keep vehicle prices down, all parties rely on consistent, on-time delivery of quality parts.

11.    The failure to deliver quality parts on-time can lead to the immediate shutdown of OEM manufacturing facilities, which can lead to special and consequential damages claims of hundreds of thousands of dollars per day.

12.     Plaintiff's General Terms and Conditions of Purchase **(Exhibit B, ¶4, ¶18, ¶22)**, which are incorporated in the Agreements, specify that time is of the essence and that all parties are aware of the critical nature of constant supply of quality parts and the need to meet customer demands.

13.     Automotive supply arrangements like the ones involved in this case often begin with the manufacture of special molds, tools, jigs and fixtures (together, "Tooling") that are used to manufacture parts to extremely exacting tolerances, with permitted variances often being less than a fraction of a millimeter.

14.     In this case, an affiliate of the Defendant manufactured Tooling for the Plaintiff to assist in manufacturing the Parts.

15.     Plaintiff has paid in full for the Tooling, and the Tooling is Plaintiff's property, supplied to the Defendant on a bailment which may be terminated by the Plaintiff at will.

16.     Replacing suppliers and maintaining quality production takes time and approval from customers.

**Defendant Has Experienced Financial Issues and Is In Default Under the Agreements**

17.     Upon information and believe, Plaintiff is the Defendant's only remaining material customer, and Defendant has experienced serious and continuing financial issues.

18.     For at least twelve (12) months, Defendant's suppliers have refused to supply goods to the Defendant on credit, and the Plaintiff has been purchasing increasing amounts of raw materials and other inventory for the Defendant to use to manufacture the Parts.

19.     Defendant's failure to maintain its own sources of supply for inventory is a default under the Agreements.

3

20.     When paying for Parts manufactured by the Defendant, the Plaintiff has been setting off the cost of the raw materials and other inventory it has purchased for the Defendant.

21.     This system has not been efficient and has resulted in delays, in part because the Defendant has been unable to determine the accurate quantities of materials it needs to make specific parts.

22.     Defendant's financial condition and repeated defaults make it difficult for Plaintiff to maintain supply of Parts to its customers.  Accordingly, as permitted under the Agreements, Plaintiff wishes to resource the Parts.

**Terms of the Agreements, Incorporation of Terms and Conditions:**

23.     The Agreements consist of several purchase orders: Purchase Order 2131, Purchase Order 2133, Purchase Order 2134, Purchase Order 2135, Purchase Order 2136, Purchase Order 2175, and Purchase Order 2223. (the "Purchase Orders").  **(Exhibit A)**.

24.     Each of the Purchase Orders are blanket orders in which Defendant is required to fulfill its obligations to Plaintiff on a requirements basis. *Id.*

25.     Each Purchase Order incorporates Plaintiff's Purchase Order Terms and Conditions (the "Terms and Conditions").  **(Exhibit B)**.

26.     The Terms and Conditions provide that:

[e]ach purchase order issued by Buyer to Seller (the "Purchase Order") is Buyer's offer for the purchase of the goods and/or services (the "Supplies") specified in the Purchase Order on the terms and conditions specified in Section 2 below. Seller's written acceptance of the Purchase Order or performance of any work or services under the Purchase Order, or any other conduct that recognizes the existence of a contract with respect to the subject matter of the Purchase Order, constitutes Seller's acceptance of Buyer's offer.

The Purchase Order includes, and hereby incorporates by reference, the express terms contained on the face of the Purchase Order, these purchase order terms and conditions, and any riders and signed documents referred to in the Purchase Order (collectively, the "Contract Documents"). The terms contained in the Purchase

Order and in the other Contract Documents constitute the entire agreement between Buyer and Seller relating to the subject matter of the Purchase Order and supersede any prior agreements… [*Id*., p 1, Sections 1-2.]

27.     The Terms and Conditions also provide that:

…Seller acknowledges and agrees that all materials, parts, assemblies, tools, jobs, dies, gauges, fixtures, molds, patterns, equipment, all related appurtenances, accessions, and accessories and other items, and any reproductions and replacements thereof, any materials affixed or attached thereto, that are furnished by Buyer (either directly or indirectly) to Seller or paid for, in whole or in part, by Buyer, including Buyer's customers, (all items above, collectively, the "Tooling"), *shall remain the property of Buyer* and shall be held by Seller on a bailment basis. The Tooling, while in Seller's custody or control and while in the custody or control of Seller's suppliers, contractors or agents, shall be labeled appropriately as the property of Buyer, shall be held at Seller's risk, shall be kept insured by Seller at Seller's expense against loss or damage in an amount equal to the replacement cost thereof, and *shall be subject to removal at Buyer's written request*. Seller shall promptly notify Buyer of the location of the Tooling, if any are located any place other than Seller's facility…*Seller shall allow Buyer to take possession of the Tooling at any time, which includes the right to enter onto Seller's premises or to require Seller to pack and ship the Tooling…to a destination selected by Buyer.* [*Id*., p 4-5 at Section 13].

28.     Defendant accepted the terms of the Purchase Orders, including the Terms and Conditions.  Upon information and belief, the Defendant did not object to any of the Terms and Conditions or propose any contrary terms.

29.     Defendant understood that "Buyer reserves the right to terminate all or any part of the Purchase Order without liability or further obligation, if Seller…(iii) undergoes a material adverse change in its financial condition…" **(Exhibit B at p. 10, Section 26)**.

30.     Further, Defendant understood that "[u]pon the termination of the Purchase Order by either party, in whole or in part, or in connection with a decision of Buyer to change to an alternate source of Supplies, including in-sourcing at Buyer's facility, (an "alternative supplier"), Seller will co-operate with Buyer in ensuring an orderly transition of supply, including as follows: …comply with Seller's obligations under Section 13." [*Id.* at p. 10, Section 27.]

5

31.     Defendant is well aware that "[i]n any action brought by Buyer to enforce Seller's obligations in connection with the production or delivery of Supplies or transition support, Seller acknowledges and agrees that monetary damages are not a sufficient remedy for any actual, anticipatory or threatened breach of the Purchase Order and that, in addition to all other rights and remedies that Buyer may have, Buyer shall be entitled to specific performance and injunctive equitable relief as a remedy for any such breach, plus Buyer's reasonable attorneys' fees." **(Exhibit B at p. 10, Section 28)**.

**Defendant's Failure to Comply with the Agreements:**

32.     When Plaintiff became aware of Defendant's financial issues and quality issues. Plaintiff went far beyond its contractual duties, actually taking on the role of supplier to Defendant to attempt to address Defendant's issues so that there would be no interruption in production of the Parts.

33.     Ultimately, as described above, Plaintiff made the business decision to identify and obtain an alternative source for the Parts.

34.     On April 6, 2023, Plaintiff notified Defendant, in writing, that it was requesting removal of a specific critical tool, designated as ASM819362 960109BU0 (the "Critical Tool"), from Defendant's facility on April 10, 2023. **(Exhibit C)**.

35.     Other tools that Plaintiff needs to remove from Defendant's facility are designated as ASM820468, ASM820469, ASM819788, ASM819787, ASM819371, ASM819370, ASM819362, ASM819326, ASM819325, ASM818729-S, ASM818728-S, ASM818727-S, ASM818725-S, ASM818724-S, ASM820947, ASM820961, ASM820948, ASM820962, ASM820949, and ASM820963 (these tools, along with ASM819362 960109BU0, are collectively, the "Tools").

6

36.     The removal of the Tools is necessary for Plaintiff to transition the Tools to an alternative supplier to produce the Parts.

37.     However, Defendant improperly advised Plaintiff that Defendant "will need to hold the tools until the following is completed: (1) All accounts receivables cleared up prior to moving the tools; (2) Take all Nissan tools back at the same time; (3) Pay for all of the program management fees for the Nissan launch including the over-fenders; (4) Purchase all remaining stock and inventory; [and] (5) Pay my resources/program management to move and count inventory to release all of these tools." **(Exhibit D)**.

38.     While reserving all rights under the Agreements, Plaintiff offered to pay all outstanding invoices and to purchase Defendant's remaining inventory in exchange for receiving Plaintiff's Tools. However, Defendant has unequivocally stated that they will effectively hold all Tools hostage until they receive $450,000 in "program management fees."

39.     The Agreements do not include any provision requiring Plaintiff to pay Defendant for the so-called "program management fees" demanded by Defendant.

40.     Furthermore, Defendant is indebted to Plaintiff in the principal amount of $1,061,639.81 for expedites and other charges incurred, an amount in which Plaintiff is entitled to recover from Defendant, among other damages which cannot be readily ascertained.

41.     Plaintiff is in material compliance with its obligations under the Agreements.

42.     However, Defendant has breached the Agreements by failing to release the Tools to Plaintiff as requested.

**Irreparable Harm:**

43.     Defendant's failure to allow Plaintiff to remove and obtain the Tools so that Plaintiff may resource the Parts threatens to cause Plaintiff substantial damages and, in turn, will

cause the risk of substantial damages to GM and Nissan because any interruption in the supply of the Parts will cause a shutdown of GM's and Nissan's operations. This is especially true given Defendant's repeated threats to cease production of the Parts given the dispute about the Tools.

44.     As a direct consequence of Defendant's actions, Plaintiff stands to suffer harm to its reputation, loss of goodwill, immeasurable supply chain interruption, shutdowns of GM's and Nissan's plants, and otherwise avoidable costs in an amount that cannot be readily ascertained.

45.     If Defendant does not allow Plaintiff to remove and obtain the Tools, Plaintiff will be unable to resource the Tools to adequately support GM and Nissan, and assembly lines for those companies will shut down within days thereafter, if not sooner.

46.     If Defendant is not immediately ordered to allow Plaintiff to remove and obtain the Tools and stop otherwise violating the Agreements, Plaintiff will continue to suffer irreparable harm.

## COUNT I – BREACH OF CONTRACT

47.     Plaintiff restates the allegations contained in each of the preceding paragraphs as though fully set forth herein.

48.     The Agreements are valid contracts and include the Terms and Conditions.

49.     The Agreements govern the business relationship between Plaintiff and Defendant.

50.     Defendant breached the Agreements in various ways, including without limitation, failing to allow Plaintiff to remove and obtain the Tools and otherwise failing to fulfill the Agreements.

51.     Defendant has no legitimate basis or contractual right to refuse to surrender the Tools upon demand.

52.     Defendant also has no legitimate basis or contractual right to demand "program management fees" prior to allowing Plaintiff to remove and obtain the Tools from Defendant's plant. Further, Plaintiff is under no obligation to agree to Defendant's demand.

53.     As a direct and proximate result of Defendant's breaches of the Agreements, Plaintiff has incurred and will continue to incur substantial damages.

54.     Unless Defendant is enjoined from its breach of its contractual obligations to Plaintiff, Plaintiff will suffer irreparable injury, including without limitation, loss of goodwill, harm to its reputation, immeasurable supply chain interruption, shutdowns of its customers' plants, and costs in an amount that exceeds $75,000, exclusive of costs, and attorneys' fees, and there is immediate and imminent danger that Plaintiff will continue to suffer irreparable harm.

55.     If Defendant refuses to meet its contractual obligation to Plaintiff, it will cause a supply chain shutdown, which would be catastrophic.

WHEREFORE, Plaintiff respectfully requests judgment against Defendant in an amount to be determined for direct and consequential damages, in addition to injunctive relief requiring Defendant to immediately allow Plaintiff to remove and obtain the Tools from Defendant's plant and stop otherwise violating the Agreements, its fees (including a reasonable attorney's fee) and expenses, as well as all other relief to which it is entitled under the law and this Court deems just and proper.

Respectfully submitted,

**DINSMORE & SHOHL, LLP**

By: /s/ Kristeena L. Johnson
Kristeena L. Johnson (KY BAR# 94994)
100 W. Main St., Ste. 900
Lexington, KY 40507
T: (859) 425-1032
F: (859) 425-1099
Kristeena.johnson@dinsmore.com

IBUTZEL\000148656\0014\100284338.v3-4/24/23

**BUTZEL LONG, P.C.**

By: /s/ Max J. Newman_____
Max J. Newman (P51483) (To be admitted PHV)
Quendale G. Simmons (P77896) (To be admitted PHV)
201 West Big Beaver, Ste 1200
Troy, MI 48084
(248) 258-2907
newman@butzel.com
simmonsq@butzel.com

Dated: April 24, 2023        Attorneys for Plaintiff

## VERIFICATION

Craig Davis, being first duly sworn, deposes and states under penalty of perjury that he has read this Verified Complaint and that the matters and claims addressed herein are true to the best of his knowledge, information, and belief, except as to the matters and/or claims which are stated to be upon information and belief, and as to those matters, he believes them to be true.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.**

ABC TECHNOLOGIES INC.

_____

Its: Vice President, Global Supply Chain

Executed On: April 24, 2023